JOHN E. BEHNKEN AND JUNE C. BEHNKEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH R. BEHNKEN AND LINDA N. BEHNKEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Behnken v. Commissioner
Docket Nos. 7350-88, 23208-88.
United States Tax Court
T.C. Memo 1990-595; 1990 Tax Ct. Memo LEXIS 666; 60 T.C.M. (CCH) 1292; T.C.M. (RIA) 90595; November 20, 1990, Filed *666 Decisions will be entered for the petitioners. Ronald D. Stanley and Douglas B. Brockhouse, for the petitioners. Michael W. Bitner, for the respondent. CLAPP, Judge.
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes in the following amounts: John E. Behnken and June C. Behnken -- Docket No. 7350-88
Year
Deficiency
1980
$ 7,080
1981
7,014
1982
7,128
1983
5,352
1984
4,583
1985
4,012
Joseph R. Behnken and Linda N. Behnken -- Docket No. 23208-88
Year
Deficiency
1980
$  8,511
1983
18,752
The deficiencies in these consolidated cases resulted from the disallowance of investment tax credits or their carryovers. From 1983 through 1985, either one or both petitioners purchased dump and tank trailers for which they claimed the credits. The deficiencies for years prior to 1983 resulted from the disallowance of excess credits carried back to those years. The issue presented is whether the terms of the trailer leases were for less than 50 percent of the useful lives of the trailers. All section references *667 are to the Internal Revenue Code, as amended and in effect for the years in issue. FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners John E. and June C. Behnken resided in New Athens, Illinois, and petitioners Joseph R. and Linda N. Behnken resided in Belleville, Illinois, at the time they filed their petitions. "Petitioners" in the plural refers to Joseph R. Behnken and John E. Behnken, who are brothers. Petitioners may also be referred to individually by their first names. During 1983 through 1985, Equity Capital Corporation (Equity Capital) owned all of the stock of Behnken Truck Services Inc. (Behnken), and Kreider Truck Services Inc. (Kreider). Behnken was in the business of transporting industrial coal in open-top dump trailers. Kreider was in the business of transporting bulk food products such as wines, vinegars, and corn syrups in 6,000-gallon tank trailers. Joseph was president of Equity Capital and Behnken and the majority shareholder of Equity Capital, and ran the daily operations of Behnken and Kreider. In 1981, John and his wife sold stock in Behnken to Joseph, and at that time executed a covenant not to compete with Behnken. *668 During 1983, John was vice president of Behnken, sat on its board, and owned stock in Equity Capital. Behnken and Kreider needed more trailers to expand their operations. It was decided that it was preferable that the corporations lease rather than purchase the required trailers because of the following financial difficulties: (1) operating losses; (2) cash-flow problems (which were caused in part by Government deregulation of the trucking industry which had resulted in more competition and lower prices); and (3) additional debt Behnken had taken on when it acquired Kreider in a leveraged buy-out. At the time Behnken purchased Kreider, it was anticipated that Behnken could reduce the buy-out debt with profits. Due to operating losses, however, this reduction had not occurred. Another reason it was preferable to lease rather than buy additional trailers was the possibility of selling the corporations. Behnken would be more marketable without having purchased new trailers because such a purchase would add even more debt to Behnken's financial position. Joseph became interested in personally purchasing dump and tank trailers. He did a study on acquiring and leasing trailers *669 by projecting the income and balance sheets of the proposed endeavor. He showed this information to John, who expressed interest in purchasing the trailers. The brothers considered that the trailers could be leased to parties other than Behnken and Kreider. Joseph viewed purchasing the trailers as an investment in his portfolio. From 1983 through 1985, one or both petitioners purchased the trailers for which they claimed the investment tax credits at issue. Petitioners leased their newly purchased trailers to Behnken and Kreider. The leases were negotiated on behalf of both the lessor and the lessee by Joseph, wearing alternatively the hats of owner-lessor and corporate president-lessee. Joseph had extensive experience in leasing transactions, and he checked with various sources in negotiating the leases. From 1983 through 1987, there were three types of leases pertaining to the relevant trailers. The leases followed each other consecutively, and we will refer to them as type A, B, and C leases. These leases were in effect as of the dates and between the parties listed below: Lessor
Lessee
Date
Type
John
Behnken
11-23-83
A
John
Behnken
12-23-83
A
Joseph
Behnken
11-23-83
A
Joseph
Kreider
11-20-83
A
Joseph
Kreider
12-23-83
A
Joseph
Behnken
12-23-83
A
John
Behnken
11-22-84
B
Joseph
Behnken
11-22-84
B
Joseph
Kreider
11-22-84
B
John
Behnken
4-1-87
C
Joseph
Behnken
4-1-87
C
*670 Title to some trailers was held in the name of the John E. Behnken Revocable Living Trust or the Joseph R. Behnken Revocable Living Trust. As petitioners retained full dominion and control over property held by their trusts and each was the sole income beneficiary during his lifetime, we refer to petitioners individually as the lessors of the trailers rather than referring to their trusts. For all type A leases, form leases were used and the blanks filled in. Each type A lease contained the following provision: TERM: This lease is for a term of 12 months, beginning and ending . All type A leases had a stated term of 1 year. The type A leases did not contain an option to renew. All type B leases contained the following paragraph -- TERM: This lease is for a term of 1 year beginning November 22, 1984. This Lease Agreement shall be extended for additional terms of one year each and upon the same terms and conditions as herein set forth provided that no notice of termination of said Lease Agreement is given by either party to the other of them, intention to so terminate shall be given prior to thirty (30) days of the end of any term.
The type *671 B leases were for a stated term of 1 year. The trailers leased under the type B leases included trailers leased under the prior type A leases. The provisions of the type B leases were substantively different from the provisions of the type A leases. The substantive changes made included the provisions regarding rent, maintenance costs, cost of insurance, and tire expenses. Trailers were periodically added to the type B leases through the use of schedules. When trailers were no longer needed, they were leased to unrelated parties. The type B leases were rescinded by mutual agreement of the parties in 1987. Type C leases were effective as of April 1, 1987, for a stated term of 2 years. These leases were in effect for years after petitioners had claimed the investment tax credits. Many trailers covered by the type B leases were re-leased under type C leases. The provisions of the type C leases were substantively different from the provisions of the type B leases. When renegotiating provisions of the type A, B, and C leases, Joseph considered the trailers' current maintenance and total operating expenses. Under the type A leases, all maintenance costs were paid by the lessor. *672 Joseph negotiated this provision because with a new trailer, maintenance costs are anticipated to be low and thus as the lessor he was willing to assume these costs. On the part of the lessee, Joseph accepted a higher rental price because the lessee would have no maintenance expenses. Under the type B leases, maintenance costs paid by the lessor generally were capped at $ 30 or $ 40 per month. As some trailers were older and required more repairs, Joseph, as lessor, negotiated a fixed amount of maintenance costs. Under the type C leases, all maintenance costs were to be paid by the lessees. As the trailers were older, they required more maintenance and Joseph as lessor was not willing to accept the risk of maintenance costs. Though they paid all maintenance costs, the lessees had a rental amount that generally was equal to 5 percent of gross hauling revenues generated by the trailers. The financial condition of Behnken and Kreider continued to deteriorate. In April 1988, the assets of the corporations were sold. Petitioners leased some and sold others of the trailers previously leased to Behnken and Kreider to the purchaser of the corporations. OPINION The parties agree *673 petitioners meet all the requirements necessary to be entitled to investment tax credits except for the requirement under section 46(e)(3)(B) that the terms of the leases must be for less than 50 percent of the useful lives of the trailers. The parties agree that the useful lives are 6 years. The stated terms of the leases pertaining to the trailers for the years in which the investment tax credits were claimed were 1 year. These terms are less than 50 percent of the 6-year useful lives of the trailers. Respondent asserts, however, that we should disregard the literal terms of the leases and find that the leases were really of an indefinite length. In deciding whether a lease is of indefinite duration or limited to the definite term specified in the lease, all the facts and circumstances are considered. .The duration of the leases is decided by the "realistic expectations of the parties at the time the lease was entered into." , affg. a Memorandum Opinion of this Court; .If it *674 appears that the substance of the transaction is that the lessee will continue leasing the property beyond the period stated in the lease, then the term specified in the lease is disregarded and the lease is considered to be of indefinite length. . The types of facts and circumstances which we consider in determining whether a lease term was indefinite are: (1) the lessor has an established practice of buying equipment for the lease in order to meet the special needs of the lessee; (2) the lessor has control of the lessee; (3) the lessor leased only to the controlled lessee; (4) the lessee leased only from the lessor; (5) the leases were renewed either automatically or without renegotiation; (6) the equipment was sold once the lessee no longer needed it; (7) the purpose of the leasing arrangement was tax avoidance; and (8) the leasing was a "financing arrangement." . We apply the above eight factors to determine whether the lease terms were indefinite. First, Joseph and John bought the trailers in part in order to meet the specific needs of the lessee. Either both *675 or one of them purchased the relevant trailers in the years 1983 through 1985. In these years, Behnken and Kreider needed and leased trailers petitioners purchased. Petitioners emphasize, however, that they also purchased the trailers as a personal investment. Joseph testified that while the prospect of leasing the trailers to Behnken and Kreider was considered in deciding to make the investment, the possibility of leasing the trailers to unrelated parties was also considered. Trailers were, in fact, leased to unrelated parties. We conclude that petitioners' purchase of the trailers was both a way to meet the special needs of Behnken or Kreider and was also a personal investment. Second, respondent asserts, and we agree, that petitioners controlled Behnken and Kreider. We consider the years in which the investment tax credits at issue were claimed, 1983 through 1985. Joseph owned approximately 70 percent of the stock of Equity Capital and ran and controlled Behnken and Kreider from 1983 to 1985. John was not a controlling shareholder, although he was vice president of Behnken in 1983. However, even if John was not in a position of control, we attribute Joseph's control to *676 him as it was Joseph who acted as John's agent in negotiating the leases. Third, we consider whether Joseph and John leased only to the controlled lessees. Joseph testified that some trailers were leased to unrelated parties and that petitioners considered this possibility when making the decision to purchase the trailers. Respondent concedes that the trailers were leased to unrelated parties, but asserts that such leasing took place only when Behnken or Kreider no longer could use such trailers. Assuming, arguendo, that respondent is correct, we do not believe petitioners' preference for leasing to their corporations before leasing to unrelated parties undermines the fact that petitioners regarded their leasing activities as a personal business endeavor separate from the activities of Behnken and Kreider. Fourth, while there is no evidence in the record which indicates that Behnken and Kreider leased from anyone other than petitioners, this fact alone does not indicate that the parties intended that the lessees would continue leasing the property beyond the period stated in the lease. Fifth, we must consider whether the leases were renewed either automatically or without renegotiation. *677 We are convinced that the terms of the leases were in fact reexamined after the prior leases expired. When negotiating on behalf of the lessor, Joseph stated that as president of Behnken, he believed it unwise for the corporations to enter into a lease for longer than 1 year because they were in a precarious financial state and were competing in a newly deregulated market. Joseph also wanted a short-term lease due to the possibility of selling the corporations and a long-term lease would be an additional financial liability making them less marketable. Joseph also wished to be able to change the terms of the leases to reflect the operating expenses of the trailers. We find Joseph's testimony on these topics credible. Also, comparing the terms of the type A, B, and C leases, we find that on the whole the provisions of the leases changed to reflect the economic realities of operating the trailers. All of these factors indicate that the leases were in fact renegotiated and were not automatically renewed. Sixth, respondent emphasized the fact that the trailers were sold once the lessees no longer needed them. It is true that petitioners sold many of the trailers to the same purchaser *678 who bought Behnken and Kreider. However, other trailers were kept by petitioners after the sale and leased to the purchaser, an unrelated party. Seventh, there is no evidence that the purpose of the leasing was tax avoidance. We assume that petitioners were aware of the tax consequences of their transactions, but such awareness does not disqualify them from receiving such benefits. Eighth, we do not believe the leasing was a financing arrangement as the consecutive, renegotiated, type A, B, and C leases contained modifications that reflected the changing costs of the trailers. Respondent asserts that the type B leases were self-extending and, thus, really for an indefinite term. We disagree. Though the language of the type B leases provided that the leases would be continued on the same terms and conditions unless notice of termination was given by either party before 30 days prior to the end of any year, this language does not make the lease indefinite. The leases provided that they would be extended for additional terms of 1 year. If a type B lease was not cancelled by giving 1 month's notice prior to 30 days before the end of the 1-year term, the lease extended for another *679 full year. Joseph testified that before the 1-year terms expired, he considered whether the leases should be allowed to renew for another year. Respondent's authority for the proposition that a lease which is self-extending is really indefinite is .However, the facts of Ridder are distinguishable from the instant case. The lease in Ridder was for a minimum of one month, had no stated term, and would end upon 30 days' written notice. . Respondent also makes the argument that Joseph's type A leases were shams. He bases this argument on the factual assertion that some of Joseph's trailers were included in two leases simultaneously. The documents under which the trailers were purportedly leased simultaneously are exhibits 60-BH and 61-BI. However, these exhibits do not make sense. The front pages of the documents contain the term clause of a type B lease, thus stating that the term of the lease begins November 22, 1984. However, the signature pages are dated October 1, 1983. Attached schedules also have October 1, 1983, and earlier dates. These exhibits *680 were admitted in evidence as stipulated by the parties. Even so, it seems highly unlikely that documents signed October 1, 1983, would create a lease that would begin in November 1984. In their reply brief, petitioners candidly state that the discrepancies in dates are not reconcilable, and are due to all parties' negligence, and that exhibits 60-BH and 61-BI should be disregarded. It seems most likely to us that when preparing the exhibits for trial, someone made a mistake by attaching pages from different leases together. We accept petitioners' position and disregard exhibits 60-BH and 61-BI. Respondent also asserts that John leased his trailer to Behnken and Kreider because he was legally bound not to lease to unrelated parties by a covenant not to compete when he sold stock in Behnken to Joseph in 1981. We find this argument without merit as there is no provision in the covenant which prevents John from leasing trailers. In the covenant, John only agreed to refrain from competing in a business similar to the business operated by Behnken. We are satisfied on the particular record before us that all the leases of the trailers were for less than 50 percent of their useful *681 lives. Accordingly, Decisions will be entered for the petitioners.